# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

JEREMY MCMILLON, )
　　　　　　　　　　 )
　　　　Petitioner, )
　　　　　　　　　　 )
v. 　　　　　　　　　 )　　No.　1:23-cv-3-DCLC-MJD
　　　　　　　　　　 )
KENNETH NELSON,[1] )
　　　　　　　　　　 )
　　　　Respondent. )

## MEMORANDUM OPINION

Before the court is a pro se petition in which Petitioner, a state prisoner, seeks habeas corpus relief under 28 U.S.C. § 2254 from his state court conviction for first-degree murder that arose from the shooting death of Larry Lebron Parks ("the victim") [Doc. 1]. *State v. McMillon*, No. E2010-01091-CCA-R3CD, 2011 WL 4424732, at *1 (Tenn. Crim. App. Sept. 22, 2011), *perm. app. denied* (Tenn. Feb. 15, 2012) ("*McMillon I*"). In his petition, Petitioner challenges this conviction by asserting claims alleging (1) denial of a fair and impartial trial in a manner that violated his right to due process; (2) prosecutorial misconduct; (3) ineffective assistance of counsel; and (4) his counsel had a conflict of interest [*Id.* at 5–10]. Respondent opposed the petition [Doc. 16] and the state court record [Doc. 15]. Petitioner replied in which he also appears to seek to add various claims and theories to support his previously asserted claims [Doc. 19]. In accordance with the Court's previous order [Doc. 21], Respondent then filed a sur reply addressing

---

[1] The Court's docket currently lists the State of Tennessee as Respondent. But Kenneth Nelson is the proper Respondent here, as he is the Warden of the Riverbend Maximum Security Institution, *see* https://www.tn.gov/correction/state-prisons/state-prison-list/riverbend-maximum-security-institution.html (last visited Jan. 15, 2026), which is where Petitioner is confined [Doc. 1 p. 1]. Rule 2(a) of the Rules Governing 2254 Cases. Accordingly, the Clerk is **DIRECTED** to substitute Kenneth Nelson as Respondent here.

Petitioner's apparent attempt to amend his petition through his reply [Doc. 22]. In the sur reply, Respondent asserts that any claims for § 2254 relief that Petitioner seeks to add in his reply are time-barred and procedurally defaulted, and that Petitioner has shown no reason to excuse that default [*See*, *generally*, *id.*].

After reviewing the parties' filings and the state court record, the Court finds that Petitioner is not entitled to habeas corpus relief under § 2254 for any of his claims. Accordingly, the Court will not hold an evidentiary hearing, *see* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007), the petition will be **DENIED**, and this action will be **DISMISSED**.

## I.      BACKGROUND

After at least two witnesses identified Petitioner to police as a person who carried a gun to the area from which gunfire that killed the victim had come [Doc. 15-30, p. 69–85, 153–169], a grand jury indicted Petitioner for first-degree murder, among other offenses [Doc. 15-1, p. 7]. The Tennessee Court of Criminal Appeals ("TCCA") summarized the evidence presented at Petitioner's trial on that charge as follows[2]:

> At trial, the State's star witness was Corey Haden, the cousin of Co-defendant Eric Carter. Mr. Haden admitted at trial that his testimony at trial was inconsistent with his testimony at a prior preliminary hearing. Mr. Haden stated that he had made mistakes in his earlier testimony. At the time of the incident involved, Mr. Haden was a juvenile. According to Mr. Haden, on the evening of March 7, 2007, he was at a cousin's home recording some songs in a recording studio. Around 8:00 p.m., Mr. Carter arrived and told Mr. Haden that he was going to go to the "front store," a convenience store and gas station in the East Lake section of Chattanooga, Tennessee. Mr. Carter asked Mr. Haden if he wanted to join him. Mr. Carter was driving his champa[gn]e-colored Ford Expedition.

---

[2] Although the Court has reviewed the entire state-court record, it draws its summaries of the relevant state-court proceedings from the Tennessee Court of Criminal Appeals' opinions, as Petitioner does not dispute those factual recitations.

When they arrived at the store there were a lot of people hanging out. Mr. Haden's brother was there. Mr. Haden got out of the vehicle to visit with his brother. Mr. Haden saw Appellant pull up in a red Pontiac Grand Am. Appellant approached Mr. Carter and said that he "heard" Mr. Carter's "car got shot up." Appellant asked Mr. Carter if he wanted to "do something about it." Mr. Carter told Appellant he wanted to "ask the dude named Peyton why he shoot [sic] up my car." Appellant told Mr. Carter he was a "pussy" and a "bitch" that "let the n____ shoot your car up and ain't going to do nothing about it." The men seemed to get into an argument about the issue. Finally, Mr. Carter told Appellant to follow him. Appellant never rode in Mr. Carter's vehicle.

At trial, Mr. Haden testified that Appellant was mad about an incident that had happened a few weeks prior during which one of his friends was shot in the face by someone in Eastdale. Appellant had made it known that he was out to "get" the people responsible for the shooting.

At that time, Mr. Carter drove his Expedition to "Mr. G's" house. Mr. Haden rode with him in the vehicle along with two other individuals; they were followed by Appellant and Lemario Branham in the red Pontiac. Mr. Carter got out, went inside, and returned with a rifle. The two cars traveled quickly down a side street off of Gillespie before stopping. Mr. Branham and Appellant exited their vehicle and walked up to Mr. Carter's Expedition. Mr. Branham had a handgun. Mr. Branham [and] Appellant[³] . . . went down the hill on foot. Mr. Haden stayed back at the vehicle and could not see them anymore.

Mr. Haden heard gunshots from at least two different guns. Mr. Haden asked Mr. Carter what was going on down there. Mr. Carter told him not to worry about it. Mr. Branham and Appellant ran back up the hill. The two unidentified men who were riding with Mr. Carter hopped out of his car and into Appellant's car before they sped off. Mr. Haden did not see a gun in Appellant's hand.

The two vehicles traveled back to "Mr. G's" house where Mr. Haden saw Appellant getting out of the vehicle with an AK–47 assault rifle. According to Mr. Haden, Appellant bragged, "I hit one of them n____s, one of them n____s dropped." Mr. Haden described Appellant as "happy" and "excited." Mr. Haden was able to identify Appellant in a lineup.

Gregory Guill[or]y, or "Mr. G," testified that he saw Mr. Carter on the night of the incident. Mr. Carter drove his vehicle to the house that night to get a gun. He was accompanied by a red car. Mr. Carter handed "Mr. G" an assault rifle that was still hot. Another person handed a handgun to Mr. Carter in a plastic bag. Mr.

---

³ The Tennessee Court of Criminal Appeals' opinion states that Mr. Haden testified that Mr. Carter also went down the hill. *McMillon I*, at *2. The trial transcript reflects otherwise. [See, e.g., Doc. 15-7, pp. 74–76, 91–93; Doc. 15-8, p. 53]. This discrepancy, however, is immaterial to the resolution of Petitioner's § 2254 claims.

3

Guill[or]y testified that he later gave the assault rifle to Mr. Carter's father. Mr. Guill[or]y testified that he did not see Appellant at his house that night.

Mr. Guill[or]y recalled that Mr. Haden was sitting in the passenger seat of Mr. Carter's vehicle and there were four people in the red car. One of the men in the red car got out and threw something in the drainage ditch. Officers later recovered a live .223 round in the drainage ditch during the investigation. They also found a .380 semi-automatic handgun in a plastic bag in Mr. Guill[or]y's backyard and a .260 caliber bolt-action rifle in the front yard.

Charlie Jefferson, a friend of the victim, testified at trial. Mr. Jefferson was with the victim on the night of the incident. The two decided to walk to the store for a quart of beer to split. They heard gunshots, and Mr. Jefferson instructed his friend to "get down." The men tried to run hand in hand to the "corner" and "hide." The victim let go of Mr. Jefferson's hand, and the two men fell to the ground. When the shots ended, Mr. Jefferson found his friend lying in a ditch "all twisted." Mr. Jefferson stated that the bullets came from the hill and were "flying everywhere." Mr. Jefferson testified that there were some "young guys" standing in the street before the shooting started.

Fingerprints were lifted from the Expedition that matched the fingerprints of Mr. Carter, Mr. Branham, Mr. Haden, and Appellant. Appellant's fingerprints were located near gunshot residue primer that was found on the Expedition on the passenger-side doorframe and armrest. Appellant's prints were on the inside and outside of the passenger side door. At the scene, authorities found twelve .223 shell casings and three .380 shell casings. The assault rifle was not located.

Several other witnesses came forward that were able to testify that a tan SUV and red car were seen on the night of the crime driving quickly down the street.

Mary Goolsby, a pathologist, testified that the victim suffered a gunshot wound to the chest. The victim was not dead on arrival at the hospital but later died as a result of the gunshot wound. The bullet entered the victim's body through his back, split his spinal cord in two, passed through his liver, his right lung, and exited the body through the chest. Marie McGee, a forensic technician who assisted in the autopsy of the victim, testified at trial. She testified that a bullet was found during the victim's autopsy and the bullet must have fallen out of the victim's clothing. The bullet was identified as a .223 caliber bullet. There was testimony from a firearms expert that the .223 caliber bullet could not have been fired from the rifle that was recovered from Mr. Guill[or]y's yard.

Appellant called Carol Pilcher, Appellant's aunt, to testify. At the time of the incident, Ms. Pilcher recalled that Appellant had been staying with her for a few weeks. On the evening of the incident, Appellant came home between 8:30 p.m. and 9:00 p.m. Ms. Pilcher remembered the time because the Jeopardy television

show had concluded. Ms. Pilcher admitted that she had a prior felony for a forged check.

*McMillon I*, at *1–3. The jury found Petitioner guilty of first-degree murder [Doc. 15-1, p. 71], the trial court entered judgment against Petitioner for this charge [*Id.* at 72], the TCCA affirmed the trial court's judgment against Petitioner, and the Tennessee Supreme Court ("TSC") denied review. *Id.* at *10.

Petitioner filed a pro se petition for post-conviction relief from his convictions [Doc. 15-26, p. 3–67] and an amended petition incorporating his earlier petition [*Id.* at 96–102]. The trial court held a hearing on the petition, which the TCCA summarized as follows:

> At the November 2018 evidentiary hearing, the petitioner notified the court that after submitting his amended post-conviction petition, "he received a letter from the State about some unprocessed evidence found at the M[edical] E[xaminer]'s office" that related to his trial case. The evidence was sealed in a package, and a report identified it as a "bullet from victim's clothing." The petitioner said that the State agreed that the unprocessed evidence should be tested. The post-conviction court noted that the petitioner's post-conviction counsel had been appointed to become a magistrate judge and that the evidentiary hearing was occurring at "the end of her six-month allotment to wrap up her pending matters" before assuming that position. Because of post-conviction counsel's time restraints, the post-conviction court determined to proceed with the evidentiary hearing while post-conviction counsel was still available to represent the petitioner and allowed the petitioner an opportunity to amend his post-conviction petition "once the bullet has been processed if the next attorney determines that that presents an issue that is appropriate for post-conviction review." Both parties agreed.
>
> The petitioner testified that the only discovery materials that trial counsel provided him were "statements from witnesses" and the transcript of the preliminary hearing. He said that he received a Tennessee Bureau of Investigation ("TBI") report involving gunshot reside [sic] from a co-defendant "a couple of days before trial." He said that he first received fingerprint evidence during trial, saying, "I never got that in discovery." He said that he asked trial counsel "several times to get a copy of my full discovery." When counsel did not provide the materials, the petitioner "had to write to the Board of Professional Responsibility" ("the Board"). The petitioner said that the Board told trial counsel to get discovery materials to the petitioner "within 30 days," at which point, trial counsel "came and talked to me, told me he was going to get it to me, but I never received it."

5

The petitioner said that he communicated with trial counsel through letters and telephone calls, noting that "I called his office several times and sometimes just left messages with his secretary to get back, and sometimes he didn't." When trial counsel "failed to respond, I had to write the [Board] again." The petitioner estimated that he met with counsel only three times in person before trial. He felt that his discussions and preparations with trial counsel were insufficient to prepare for trial. "There's a lot of stuff that we were asking for that we never got before trial . . . and [trial counsel], he failed . . . to file a continuance so that we can get the evidence that we needed . . . [to] prepare a proper defense."

The petitioner said that the State waited until "like, a week before trial" to send a shirt that the petitioner had worn the day of the offenses to the lab for testing. He recalled that the trial court admonished the State for its delay in seeking to have the evidence tested. He said that the testing "was negative on all my clothes" but that trial counsel did not receive the results of that testing until "a day or two before" or sometime "during the trial." The petitioner reiterated that he asked trial counsel to seek a continuance "so that we can be able to look at the evidence and prepare a proper defense so we won't go in and just rush."

The petitioner testified that the day before trial, counsel told him that the petitioner's fingerprint had been found on the window of Mr. Carter's vehicle and that he explained to trial counsel how his print came to be on Mr. Carter's vehicle. He said that Mr. Carter explained the same circumstances in an affidavit. The petitioner also said that sometime before trial, he learned that Mr. Branham had written a letter to Mr. Carter, saying that they were "gonna put it on" and "keep blaming" the petitioner for the offense. The petitioner said that Mr. Carter gave the letter to trial counsel but that counsel did not address the letter at trial despite the petitioner's asking him to bring it up.

The petitioner said that counsel advised him not to testify at trial because the State would "try to bring up my past history." He said that despite his having "no past violent history," counsel "told me it was not in my best interest to testify in my own trial on my behalf." The petitioner said that he wanted to testify but that counsel never told him that he had a right to testify.

The petitioner said that in a pretrial statement, the victim's son, Eric Norman, indicated that he knew "who the perpetrators were" and identified one of the perpetrators as "Bone." The petitioner said that he wanted trial counsel to call Mr. Norman to testify to the identity of the perpetrators but that counsel told him that Mr. Norman was "the son of the victim" and that counsel had "been representing him probably, like, over 25 years, so if we do call him as a witness," there "would be certain things that he can't ask him about because prior representation towards him and his family." The petitioner said that he filed two or three "motions to relieve counsel" because counsel "was the victim's family lawyer." He said that the court denied one of the motions and did not address the others.

The petitioner said that his "Aunt Carol" and the father of his aunt's baby told trial counsel that the petitioner had been with them on the night of the offenses. To his knowledge, trial counsel did not speak with anyone else in his family. The petitioner wanted trial counsel to investigate certain issues, including statements by Mr. Haden that the petitioner had a red car and that someone named Tim Sexton had shot a friend of the petitioner in the face. The petitioner said that he did not own a red car and that he "never had a problem" with Mr. Sexton.

The petitioner said that at trial, the State introduced "a .260 rifle and a mask" that had been discovered at the house of Greg Guillory. He said that he had never been to Mr. Guillory's house and that the rifle was "brand new" and had "never been used," and, despite these items having nothing to do with his case, trial counsel failed to object to their introduction.

The petitioner testified that during jury voir dire, the State referred to the area where the offenses occurred as "a war zone" despite the trial court's excluding evidence of gang activity and admonishing the State to avoid referring to the area as "'the wild Wild West.'" The petitioner believed that the prosecutor inflamed the emotions of the jury during voir dire by his comments and by showing pictures of the petitioner's tattoos in an attempt to show that the petitioner was "a thug."

During cross-examination, the petitioner acknowledged that he filed one of the motions to relieve counsel after trial but said that he "filed two before that which w[ere] never addressed." He said that he waited to move to relieve counsel until the Board "let me know what action was taken" on his complaints. He also said that he sought to have new counsel on appeal because trial counsel "wasn't effective in my trial and I didn't want him to file my appeal or my motion for new trial and mess things up any more worse than they was." He said that he wrote to the Board about trial counsel three times: in "early 2008," "later on in 2008," and the "beginning of 2009." He said that two of the letters were about trial counsel's prior representation of the victim's son and one was about counsel's failure to communicate with him. He acknowledged that he did not raise these issues with the trial court but explained that the Board "wrote me back and they told me that they was going to contact [trial counsel]" and "would let me know what action was taken." He said that in each instance, the Board contacted trial counsel about the complaint and that trial counsel "wrote me back and said he was going to ... do better, he was going to be more effective then." The petitioner said that he wrote a letter to the trial judge to complain of trial counsel's representation but that he heard from the Board before mailing it. He said that in another instance, he wrote a letter to the trial court in January or February 2009 "and asked him to relieve counsel" but the issue "was never addressed." He said that although he did not receive a hearing on the request for new counsel, trial counsel had been notified about the matter "because he came and asked me about it."

The petitioner said that he "felt like [trial counsel] wasn't fighting for me and doing what he [was] supposed to do for me in my defense because of the fact that he was

the victim's family lawyer . . . . I felt like he had loyalty . . . to the victim's family." He said that he did not learn of trial counsel's having previously represented members of the victim's family until February or March 2009. He said that counsel told the trial court of his prior representation of the victim's family because "he had to."

The petitioner said that counsel told him that if he called Mr. Norman as a witness that counsel would not be able to ask Mr. Norman "certain questions" about Mr. Norman's "past and questions about the people that he knew, like the guys he said he knew" because counsel had "represented him prior to my trial." The petitioner explained that Mr. Norman had made a statement that he had seen the four men involved in the shooting and that "he knew the guys personally" and that "nary one of them was me." The petitioner further explained that Mr. Norman "used to be a gang member," and that Mr. Norman reported seeing during the shooting were "some of his gang members." Because trial counsel learned of Mr. Norman's gang affiliation in the course of a "client-attorney relationship," counsel said that he "wouldn't be able to ask [Mr. Norman] about his past and about the guys he knew and how did he know them." The petitioner said that trial counsel talked to Mr. Norman sometime before trial and that Mr. Norman "was irate and . . . cussed [counsel] out." Trial counsel told the petitioner that Mr. Norman would be a hostile witness if called at trial.

The petitioner said that he had an alibi and that at the time of the offenses, he was at his aunt's house on 28th Street in "the Eastlake area." He acknowledged that he spoke with Mr. Carter at approximately 8:00 p.m. at an Eastlake store the night of the shooting but said that he returned to his aunt's house before the shooting. The petitioner said that although his aunt, Carol Pilcher, testified at trial as an alibi witness, trial counsel should have further investigated alibi witnesses, including Vincent Johnson, the father of Ms. Pilcher's baby, and Ms. Pilcher's teenage son and 11- or 12-year-old daughter, all of whom were at Ms. Pilcher's house when the petitioner arrived that night.

The petitioner acknowledged that trial counsel learned of the negative results of the gunshot residue tests "the day before trial" but said that counsel did not discuss it with him until "[t]he day during trial." He asserted that had trial counsel moved for a continuance as he asked, counsel would have had time to obtain the written reports and "would have been able . . . to actually show to the jury the letters from the TBI personnel that my hands w[ere] negative on gunshot residue and my clothes [were] negative on gunshot residue. He never had the paperwork to show that." The petitioner acknowledged that trial counsel "mentioned" the negative gunshot residue tests at trial.

The petitioner said that during jury voir dire, the State asked the jury, "'Are you familiar with the Eastdale area?'" When the potential jurors indicated that they were, the State said, "'So you know about the gangs and the, and the wild Wild

West.'" The petitioner said that the prosecutor then said about the neighborhood: "'Oh, it's a war zone. You never been in Eastdale, it's a war zone.'"

On redirect examination, the petitioner said that the gunshot residue test results that were returned the day before trial indicated that the petitioner's hands and clothes were negative for gunshot residue but that the seat in Mr. Carter's Expedition where Mr. Haden claimed to be seated "the whole entire time" was positive for gunshot residue. The petitioner said that in reviewing the discovery materials and the proceeding transcripts, he discovered inconsistent statements from Mr. Haden and asserted that counsel did not adequately attack Mr. Haden's credibility. He also said that counsel failed to explain to the jury how the petitioner's fingerprints came to be on the inside of the passenger's door of Mr. Carter's vehicle.

Upon questioning by the court and a review of "the rule docket," the petitioner acknowledged that the only letters that he mailed to the trial court seeking to have trial counsel removed from his case were sent after trial. He said that he had written two other letters to the court but that he "was mistaken" about believing that he had mailed them.

Trial counsel testified that he did not recall any letters from the Board related to his representation of the petitioner but acknowledged that it was "possible I could have gotten one stating . . . that [the petitioner] wanted to see me or something of that nature." Counsel said that the petitioner's assertion that counsel met with him only a few times before trial was "just outrageous." Counsel said that he "went to the TBI office more than once to interview firearm experts, blowback experts, [and a] fingerprint expert." Trial counsel could not recall whether he sought any continuances or whether any were granted in this case but said, "Just like other murder cases, there probably were continuances." He said: "I would not have pushed the [c]ourt to try the case. If the case could have been continued, that would have been fine with me."

As to counsel's prior representation of Mr. Norman, trial counsel said, "I don't know that I was aware that I knew Eric Norman from the outset of the case, but I believe at some point I recalled that I may have represented Eric Norman, and I tried to go back and find out whether I had done so or not." He continued, "It would have been years, probably many years prior to the trial of this case." Counsel said that he did not know what the petitioner meant when he said that counsel was the victim's "family lawyer." Counsel recalled that he "met with Mr. Norman, ... and he did not want to testify" because he "was concerned about gang violence and he wasn't happy about the idea of coming to court." Trial counsel said that Mr. Norman did not "identify the four people that he said he saw" other than referencing "somebody named Bone." Counsel said that Mr. Norman "would not tell me if he came to court and testified whether he would state that [the petitioner] was involved or whether he was not involved. He wouldn't commit to either one." Mr. Norman also told counsel that "he would wear a tee shirt to court with [the petitioner's] picture on it flashing a gang sign if he had to come to court." Counsel determined

9

that Mr. Norman "was going to be unpredictable and perhaps not helpful." Counsel denied that his prior representation of Mr. Norman affected his decision whether to call him as a witness.

Trial counsel recalled that he objected at trial to the State's use of the mask discovered at Mr. Guillory's house. Counsel also recalled that he met with Ms. Pilcher and another relative of Ms. Pilcher's to investigate the petitioner's alibi defense. Trial counsel said that in hindsight, he "regret[ted] that Ms. Pilcher testified." He said that he did not think that it was a good strategy to call her as a witness but that the petitioner "was emphatic that he wanted her to testify, so I called her."

Trial counsel did remember receiving a letter from Mr. Carter to Mr. Branham but said that the petitioner asked him to speak with Mr. Carter after Mr. Carter had reached out to the petitioner. Trial counsel said that he "met with Mr. Carter, got a statement from him" and "[f]iled something with the [c]ourt." He said that he also had Mr. Carter present for the motion for new trial hearing "or some subsequent proceeding, in an effort to bring that evidence to the [c]ourt's attention." He said that he found the information compelling "[a]t the time."

Trial counsel said that the State made an initial plea offer with a 25-year sentence. Through negotiations, the State "came down to 15, and I think the final offer we got was eight years." Trial counsel went with the petitioner's father to speak with the petitioner because, even with the State's plea offer, the petitioner "still wanted to go to trial."

Trial counsel said that "Corey Haden was the State's case" and that other than Mr. Haden's testimony, "there was not a whole lot of evidence that would have tied [the petitioner] to this matter." Counsel said that "[t]here were inconsistencies in [Mr. Haden's] statements" but that "I did the best I could" to address them.

During cross-examination, trial counsel said that he met with Ms. Pilcher and Mr. Johnson and gave notice to the State that he would call both of them as alibi witnesses. Counsel agreed that he represented Mr. Norman on a driving charge and a simple possession of marijuana charge and said that he notified the trial court of this prior representation on March 20, 2009.

Upon questioning by the court, trial counsel said that he did not feel that his prior representation of Mr. Norman created an actual conflict. He acknowledged that he gave the following notice to the trial court: "'I expect testimony of Eric Norman to be favorable to the defendant. I have no intention to impeach this witness.'" "'I obtained no information from my representation of him which might be used for impeachment or any other purpose in this case.'" "'I further represent that I have informed the defendant of my prior representation and that he has no problem with my continuing to represent him.'" Counsel did not recall the petitioner's having any concern over his prior representation of Mr. Norman.

10

Johnny Lorenzo McMillon, Sr., the petitioner's father, testified that he remembered trial counsel's discussing a plea offer with him one week before trial, but he could not remember the details of the offer. He said that his initial reaction to the plea offer was that the case "should go to trial" because "this was like . . . something just pinned on" the petitioner.

At the close of the evidence, the post-conviction court addressed the issue of the piece of unprocessed evidence discovered at the Medical Examiner's office. The State told the court that it intended to send the item to the TBI laboratory for DNA and ballistics testing. The post-conviction court determined that it would hold its ruling in abeyance until the test results from the unprocessed evidence were complete and the petitioner had an opportunity to consider any additional post-conviction claims arising from that piece of evidence.

On June 3, 2019, the State entered the TBI test results of the previously-unprocessed piece of evidence as a late-filed exhibit to the evidentiary hearing. On July 11, 2019, the post-conviction court appointed the petitioner new counsel and allowed the petitioner 120 days to "request to reopen the post-conviction hearing." On February 24, 2020, the petitioner moved to reopen the evidentiary hearing to allow him an opportunity to cross-examine the technician who performed the TBI's testing.

The evidentiary hearing was reopened on June 3, 2020. Charly Castelbuono, an employee at the TBI forensic biology unit, testified as an expert in DNA testing and forensic examination. She said that she received a bullet that was identified as being "from the victim's clothing." In her testing of the bullet, she was able to "isolate the DNA" and "determine[ ] how much was there," but she was not able to develop a DNA profile because she was able to detect only "a very small amount." She said that it was possible that the DNA present on the bullet had somewhat degraded over the years. She said that the bullet had undergone ballistics testing in 2008, and the report of that testing identified the bullet as being "consistent with a .223 REM caliber class metal-jacketed bullet."

*McMillon v. State*, No. E2020-01260-CCA-R3-PC, 2022 WL 1002410, at *1–6 (Tenn. Crim. App.

Apr. 4, 2022), *perm. app. denied* (Tenn. Sept. 28, 2022) ("*McMillon II*").

The post-conviction court denied the petition for post-conviction relief [*Id.* at 107–8, 110–

35]. The TCCA affirmed the denial of Petitioner's petition for post-conviction relief, and the

Tennessee Supreme Court declined review. *McMillon II*, at *8–15.

Petitioner next filed the instant § 2254 petition [Doc. 1].

## II.    STANDARD OF REVIEW

The Court's review of the habeas corpus petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which allows a federal court to grant habeas corpus relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The AEDPA provides that the Court may grant such relief on any claim adjudicated on the merits in a state court only where that adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" United States Supreme Court precedent; or (2) "resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

This Court may grant habeas corpus relief under the "contrary to" clause where the state court (1) "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law; or (2) decide[d] a case differently than the Supreme Court on a set of materially indistinguishable facts." *See Williams v. Taylor*, 529 U.S. 362, 405 (2000). The Court may grant habeas corpus relief under the "unreasonable application" clause where the state court applied the correct legal principle to the facts in an unreasonable manner. *Id.* at 407.

But even an incorrect state court decision is not necessarily unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." (citing *Williams*, 529 U.S. at 410)). Rather, this Court may grant relief for a claim decided on its merits in state court only where the petitioner shows that the state court ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Also, before a federal court may grant habeas corpus relief, the petitioner must have exhausted his available state remedies for the claim. 28 U.S.C. §2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to have "fairly presented" each federal claim to all levels of the state appellate system to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) (citing *Justices v. Boston Mun. Court v. Lydon*, 466 U.S. 294, 302–03 (1984)). For a petitioner to have exhausted a § 2254 claim, he must have presented "the same claim under the same theory" to the state courts. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987); *see also Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009) (finding constitutional claim must be presented in federal court under the same theory as presented in state appellate process). In Tennessee, presentation of the claim to the TCCA satisfies this requirement. Tenn. S. Ct. R. 39.

If a prisoner never presented a claim to all state court levels and a state procedural rule now bars presentation of the claim, he procedurally defaulted that claim. *Coleman v. Thompson*, 501 U.S. 722, 731–32, 750 (1991). In those cases, the claim is technically exhausted but procedurally defaulted. *Gray v. Netherland*, 518 U.S. 2074, 2080 (1996); *Coleman*, 501 U.S. at 732; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted."). In Tennessee, petitioners may generally proceed only through one full round of the post-conviction process, and Tennessee imposes a one-year statute of limitation on such actions. Tenn. Code Ann. § 40-30-102(a) (one-year limitation period), § 40-30-102(c) ("one petition" rule).

Procedural default may also occur when a petitioner presented the claim to the highest state court, but that court could not "reach[] the merits of the petitioner's claim" because the petitioner

13

failed to comply with an applicable state procedural rule, which is regularly enforced and an independent state ground that supports the judgment. *Walker v. Martin*, 562 U.S. 307, 315 (2011).

On federal habeas review, the district court may review a procedurally defaulted claim only where the petitioner shows cause for that default and actual resulting prejudice, "or . . . that failure to consider the claim[] will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 749–50. Errors of post-conviction counsel cannot generally serve as "cause" to excuse a procedural default. *Coleman*, 501 U.S. at 753–53. But the Supreme Court established an equitable exception to this rule in *Martinez v. Ryan*, holding that the inadequate assistance of post-conviction counsel or the absence of such counsel may establish cause for a prisoner's procedural default of an ineffective assistance of trial counsel claim under certain circumstances. *Martinez v. Ryan*, 566 U.S. 1, 9, 17 (2012). The Supreme Court has described the *Martinez* exception as follows:

> [The exception] allow[s] a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim;" and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 13–14, 16–17). The *Martinez* exception applies in Tennessee. *Sutton v. Carpenter*, 745 F.3d 787, 792–95 (6th Cir. 2014). But *Martinez* does not excuse a petitioner's failure to develop a factual record for a claim, even where he attributes that failure to the ineffective assistance of his post-conviction counsel. *Shinn v. Ramirez*, 142 S. Ct. 1718, 1735 (May 23, 2022).

## III.  ANALYSIS

The Court will first summarize the claims Petitioner has raised in his relevant filings before addressing the untimeliness of any new claims in Petitioner's reply, Petitioner's procedural default

14

of the claims and theories in his reply that he did not raise to the TCCA, and Petitioner's remaining claims.

## A. Petitioner's Relevant Filings

In his direct appeal challenging his conviction, Petitioner asserted claims that (1) the evidence was insufficient to support his conviction; (2) no evidence other than the testimony of Mr. Haden, as an alleged uncharged accomplice, supported Petitioner's conviction; (3) the trial court erred in admitting the bullet found during the victim's autopsy as evidence; and (4) the trial court erred in failing to grant a new trial based on an affidavit from Mr. Carter exonerating Petitioner [Doc. 15-20]

In his appeal of the denial of his petition for post-conviction relief to the TCCA, Petitioner asserted claims that (1) his counsel was ineffective with regard to his prior representation of Mr. Norman or, alternatively, his counsel was ineffective with regard to interviewing Mr. Norman before trial; (2) his counsel was ineffective for not asking for a continuance on March 23, 2009; (3) his counsel was ineffective for allowing the prosecution "to subject the jury to bias" through "an irrelevant life photograph of the victim, inflammatory statements, and the explanation of the law and courts," and the prosecution also committed prosecutorial misconduct through its "improper statements of law" and "inflammatory statements"; (4) his counsel was ineffective with regard to his cross-examination of Mr. Haden due to his inadequate preparation and failure to seek a continuance; (5) his counsel was ineffective for not cross examining Mary Goolsby regarding improper expert testimony about "low velocity bullets and their indicia"; (6) his counsel was ineffective for not objecting to hearsay testimony from Officer Jones regarding where the bullets came from; (7) his counsel was ineffective for not objecting to speculative evidence from Parnell Bell regarding the owner of the tan SUV; (8) his counsel was ineffective for not objecting to

hearsay and speculative evidence from Mr. Guillory; (9) his counsel was acted deficiently "by ineffectively presenting any defense"; (10) his counsel was ineffective for not communicating an eight-year guilty plea offer; and (11) the cumulative errors of Petitioner's trial counsel entitled him to relief because the prosecution called fourteen witnesses, but Petitioner's counsel only called two, and (a) only one witness, specifically Mr. Haden, identified Petitioner, and his testimony was impeached as inconsistent; (b) five witnesses were identified as part of Petitioner's ineffective assistance of counsel claims; (c) the timing of the fingerprints entered into evidence was not established; and (d) defense counsel was deficient regarding presenting a defense because he "abandoned the defense witnesses' credibility and then argu[ed] unsupported argument before the jury" [Doc. 15-32].

In his § 2254 petition, Petitioner challenges his conviction by asserting that (1) he was denied a fair and impartial trial in a manner that violated his right to due process, in support of which he states that (a) the prosecution used "false evidence and false testimony to convict [him]," (b) a .260 action bolt rifle was presented as evidence even though no murder weapon or fired weapon was ever found, and (c) the prosecution's "star witness" made inconsistent statements and admitted to lying at trial; (2) the prosecution made improper statements to the jury; (3) his counsel was ineffective because he allowed the prosecution to use false evidence to convict him, failed to object to the prosecutor's improper remarks, and did not raise certain issues on direct appeal that Petitioner asked him to raise; and (4) his counsel had a conflict of interest based on his prior representation of Eric Norman [Doc. 1 p. 5–11].

Petitioner's last relevant filing is his reply to Respondent's response in opposition to his petition, which he signed on August 25, 2023 [Doc. 22]. This filing is forty-five mostly single-spaced pages of dense, repetitive, and lengthy factual and legal arguments and citations [*See*,

*generally*, *id.*]. In this reply, Petitioner raises various legal claims and theories, many of which he did not previously raise in his timely petition [Doc. 1] and/or to the TCCA in his direct appeal and appeal of the denial of his petition for post-conviction relief [Docs. 15-20, 15-32].

In the first twenty pages of his reply, Petitioner asserts that, among other things, (1) the prosecution violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963) by suppressing evidence that favored Petitioner; (2) the prosecution used false testimony against Petitioner in violation of the *Napue v. Illinois*, 360 U.S. 264 (1959) and *Giglio v. United States*, 405 U.S. 150 (1972) line of cases; (3) he was convicted based on solely on the unsubstantiated testimony of an uncharged accomplice, namely Mr. Haden, in violation of Tennessee law and despite Mr. Haden's previous statements inconsistent with his trial testimony; (4) his counsel failed to ask for a continuance after the late analysis of Petitioner's clothes; (5) his counsel was ineffective with regard to Ms. Pilcher, a surveillance recording, Eric Norman, a letter from Lemario Branham, introduction of a mask and a rifle from Mr. Guillory's house as evidence, and the prosecution's improper statements; (6) the prosecution's statements referring to groups of criminals and street violence and characterizing Eastdale as violent were improper; (7) he has raised most, if not all, of the claims from his post-conviction appeal and direct appeal in this action; and (8) he should be able to raise claims for the ineffective assistance of his counsel on direct appeal in this action [Doc. 19 p. 1–20].

In the next eighteen pages of his reply, Petitioner cut and pastes Respondent's response in opposition to his petition [*Id.* at 20–38].

Then, in the last seven pages of his reply, Petitioner asserts (1) that the trial court denied his requests for a new lawyer; (2) that his trial counsel did not sufficiently communicate with him during the criminal proceeding, did not investigate or present mitigation evidence, and was generally deficient; (3) that the cumulative errors of his counsel and the trial court denied him a

17

fair and impartial trial in violation of his due process rights; (4) a claim for violation of the Confrontation Clause; (5) that the prosecution violated *Brady* and presented false evidence/testimony; and (6) that his counsel failed to timely meet with him, "accorded the state requested introductions at trial for the first time," and "[sought] jury out hearing for introduction of discoverable proof at trial for prosecuting the case" [*Id.* at 38–44]. Petitioner then states that the Court should review all his claims on the merits [*Id.* at 45].

### B. Reply Claims

In his reply, Petitioner seeks to bring a number of new substantive claims and/or new theories in support of previously raised claims. That said, any new claims Petitioner raises in his reply that he did not raise in his original petition are untimely and subject to dismissal on this ground. Also, the new claims and new theories in support of previously raised claims that Petitioner seeks to assert in his reply but did not raise in his appeals to the TCCA are subject to dismissal under the doctrine of procedural default. Accordingly, the Court will not address these claims or theories on the merits, and they will be **DISMISSED**.

#### 1. Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified in 28 U.S.C. § 2241, *et seq.*, provides a one-year statute of limitations for the filing of an application for a federal writ of habeas corpus. The statute provides:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State Court. The limitation period shall run from the latest of—
>
> (A)    the date on which the judgment became final by the conclusion of direct review . . . .

28 U.S.C. § 2244(d)(1).

After a Hamilton County jury rendered a verdict against Petitioner for first-degree murder [Doc. 15-1, p. 71] and the trial court entered judgment against Petitioner [*Id.* at 72], Petitioner appealed that conviction [Doc. 15-20]. The TCCA affirmed the trial court's judgment [Doc. 15-22], and on February 15, 2012, the TSC denied review [Doc. 15-25]. Accordingly, the AEDPA statute of limitations began to run on May 17, 2012, the day after Petitioner's 90-day window to request review of his conviction by the United States Supreme Court closed. *Clay v. United States*, 537 U.S. 522, 524 (2003) (holding that, if no petition for certiorari is filed, the judgment becomes final upon expiration of the ninety-day period for seeking certiorari review in the Supreme Court).

The AEDPA statute of limitations ran for 238 days until January 11, 2013, when Petitioner paused it by filing a pro se petition for post-conviction relief [Doc. 15-26 p. 3–66]. Tenn. Sup. Ct. R. 8, § 2(G). The clock began to run again on September 29, 2022, the day after the Tennessee Supreme Court denied review of the Tennessee Court of Appeals' affirmance of the denial of the post-conviction petition [Doc. 15-39]. The clock then expired on February 3, 2023, which is more than six months before Petitioner filed his reply on August 25, 2023 [Doc. 22]. And while Petitioner timely filed his § 2254 petition [Doc. 1] before the AEDPA statute of limitations passing, this filing did not toll the AEDPA's statute of limitations. *See Duncan v. Walker,* 533 U.S. 167, 181–82 (2001).

Accordingly, the new claims in Petitioner's reply are untimely, and he has not set forth any reason for the Court to toll the statute of limitations. Thus, the Court will not address those claims on the merits.

### 2. Procedural Default

As the Court noted above, to exhaust a claim for relief under § 2254, a petitioner must have presented "the same claim under the same theory" to the state courts. *Pillette*, 824 F.2d at 497; *see*

*also Wagner*, 581 F.3d at 418. Petitioner, therefore, procedurally defaulted any claims or theories raised in his reply that were not previously presented to the TCCA. Petitioner's attempt to attribute these defaults to appellate counsel fares no better. To the extent Petitioner relies on ineffective assistance of appellate counsel as cause for failing to raise certain claims or theories on direct appeal, that claim itself was never presented to the Tennessee Court of Criminal Appeals and is therefore procedurally defaulted. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (providing that "an ineffective-assistance-of counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted").

Accordingly, the claims and theories raised for the first time in Petitioner's reply are procedurally defaulted, and the Court will not address these claims or theories on the merits.

### C. Due Process

As set forth above, Petitioner alleges that he was denied a fair and impartial trial, in violation of due process, based on "false evidence and false testimony" presented at his trial. In support, he points to trial evidence of a .260 bolt action rifle, the lack of any evidence identifying the murder weapon, and Mr. Haden's trial testimony [Doc. 1, p. 5]. Respondent argues that Petitioner did not present a substantively identical claim to the state courts and therefore procedurally defaulted this claim, noting that Petitioner concedes he did not exhaust it because he "raised [it] in ineffective assistance of counsel" proceedings rather than as a freestanding due process claim [Doc. 16, pp. 24–26; Doc. 1, p. 5].

Petitioner's due process claim based on cumulative errors does not entitle him to relief under § 2254 for three reasons. First, the claim is not cognizable on federal habeas review. Second, this claim is procedurally defaulted because it rests on grounds different from those presented to the TCCA, and Petitioner has not established cause and prejudice to excuse that

default. Third, even if the Court could liberally construe this claim to be the same cumulative error claim addressed by the TCCA, which it cannot, Petitioner has not established that the TCCA's denial of this claim was unreasonable.

First, Petitioner's due process claim based on cumulative error is not cognizable herein, as the Supreme Court has never held that "constitutional claims can be cumulated to grant habeas relief[.]" *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002) ("The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief.").

Second, the cumulative error claim Petitioner raises in his § 2254 petition relies on different factual and legal grounds than the cumulative error claim he presented to the TCCA in his appeal from the denial of post-conviction relief. [*Compare* Doc. 1, p. 5 *with* Doc. 15-32, p. 89–94]. Thus, because Petitioner did not present "the same claim under the same theory" to the TCCA, this claim is procedurally defaulted. *Pillette*, 824 F.2d at 497; *see also Wagner*, 581 F.3d at 418.

To the extent Petitioner seeks to blame his appellate attorney for failing to raise the due process claim he raises in his § 2254 petition to the TCCA in his direct appeal, he again procedurally defaulted that claim for ineffective assistance of appellate counsel by not exhausting it with the TCCA. *Edwards*, 529 U.S. at 453 (providing that "an ineffective-assistance-of counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted"). Additionally, to the extent that Petitioner blames his post-conviction appellate counsel for not raising that ineffective assistance of appellate counsel claim in the appeal of the denial of his post-conviction petition, such a claim is not cognizable here. *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017) (declining to extend the scope of *Martinez* to include procedurally defaulted claims of ineffective assistance of direct appellate counsel due to ineffectiveness of post-

conviction counsel).  As a result, Petitioner has not shown cause or prejudice to excuse his procedural default of this claim.

Finally, even if the Court could very liberally construe the petition to raise the same cumulative error claim addressed by the TCCA, which it cannot, Petitioner would still not be entitled to relief.  The TCCA denied this claim because Petitioner had not established that any of the acts of his counsel underlying this claim amounted to ineffective assistance of counsel. *McMillon II*, at \*14.  And Petitioner has not identified, and the Court does not discern, any unreasonable application of federal law or unreasonable determination of the facts in light of the evidence presented in the TCCA's denial of this claim or the TCCA's denial of the underlying ineffective assistance of counsel claims.

Petitioner is thus not entitled to relief under § 2254 based on his due process cumulative error claim.

### D.    Prosecutorial Misconduct

Petitioner next claims that the prosecution improperly used terms to inflame the jury's emotion and encouraged them to convict him to protect the public [Doc. 1, p. 7].  Petitioner raised this claim to the TCCA in his appeal of the denial of his petition for post-conviction relief, and the TCCA found that he had waived it by not raising it on direct appeal.  *McMillon II*, at \*14.   The TCCA cited Tenn. Code Ann. § 40-30-106(g) to support this ruling.  *Id.*  This statutory subpart provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented" and sets forth two exceptions to this rule that are not relevant here.  Tenn. Code Ann. § 40-30-106(g).

Tenn. Code Ann. § 40-30-106(g) is a firmly established and regularly enforced independent rule in Tennessee. *See, e.g., Cone v. Bell*, 243 F.3d 961, 969 (6th Cir. 2001), *overruled on other grounds by Bell v. Cone*, 535 U.S. 685 (2002) (finding Tennessee's waiver statute to be independent and adequate state rule that is regularly enforced); *Ralph v. Sexton*, No. 4:13-CV-53-HSM-SKL, 2016 WL 4574682, at *10 (E.D. Tenn. Sept. 1, 2016) (finding Tenn. Code Ann. § 40-30-106(g) "an adequate and independent state ground sufficient to foreclose habeas review"); *Holland v. State*, 610 S.W.3d 450, 457–60 (Tenn. 2020) (citing and applying Tenn. Code Ann. § 40-30-106(g) in reversing the TCCA's decision to *sua sponte* raise a claim that the post-conviction petitioner had failed to raise in earlier proceedings); *Stanhope v. State*, 2018 WL 1884656 (Tenn. Crim. App. April 19, 2018) (applying Tenn. Code Ann. § 40-30-106(g) to find that a post-conviction petitioner waived a claim by failing to present it in earlier proceedings and citing various cases likewise finding that post-conviction petitioners waived claims by not raising them in earlier proceedings where they could have done so). Accordingly, the record demonstrates that TCCA based its rejection of this claim on this state law rule that is both independent of the federal question and adequate to support the judgment, and Petitioner therefore procedurally defaulted this claim. *Walker*, 562 U.S. at 315.

In his reply, it appears that Petitioner tries to excuse his default of this claim by asserting that his appellate counsel was ineffective for not raising it [Doc. 19, p. 16–19]. Once again, however, Petitioner cannot rely on the ineffective assistance of his appellate counsel to establish cause to excuse a procedural default in a federal habeas corpus action without first exhausting that ineffective assistance of appellate counsel claim in the state courts, which he did not do. *Edwards*, 529 U.S. at 453 (2000) (providing that "an ineffective-assistance-of counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted").

23

Accordingly, this Court will not address this claim on the merits, and Petitioner is not entitled to § 2254 for this claim.

### E. Ineffective Assistance of Counsel

Petitioner next claims that his counsel was ineffective for (1) allowing the prosecution "to use false evidence," (2) failing "to object to improper arguments," and (3) failing to raise unspecified arguments on appeal that Petitioner asked him to raise [Doc. 1, p. 8].

As for Petitioner's third claim, which concerns ineffective assistance of appellate counsel, the record reflects that Petitioner raised no such claim to the TCCA. That claim, therefore, is procedurally defaulted. *Edwards*, 529 U.S. at 453. And *Martinez* does not excuse any failure by Petitioner's post-conviction counsel to raise an ineffective assistance of appellate counsel claim. *Davila*, 137 S. Ct. at 2067. Petitioner is thus not entitled to relief for this claim under § 2254.

The Court will now address Petitioner's remaining ineffective assistance of counsel claims, which it liberally construes alleging that Petitioner's trial counsel was ineffective with regard to (1) Mr. Haden's trial testimony, (2) testimony regarding evidence recovered at Mr. Guillory's house, and (3) the prosecution's statements implicitly referring to gang/war activity. These claims correspond to those Petitioner raised in his appeal from the denial of his post-conviction petition [Doc. 15-32].

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This includes the right to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was

24

> not functioning as the "counsel" guaranteed the defendant by the Sixth
> Amendment. Second, the defendant must show that the deficient
> performance prejudiced the defense. This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable. Unless a defendant makes both showings, it cannot be said
> that the conviction . . . resulted from a breakdown in the adversary process
> that renders the result unreliable.

*Strickland*, 466 U.S. at 687. A petitioner has the burden of proving ineffective assistance of his counsel. *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A party asserting an ineffective assistance of counsel claim must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires a claimant to show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

The Supreme Court has emphasized that a claimant must establish both prongs of a claim for ineffective assistance of counsel to meet his burden, and if either prong is not satisfied, the claim has no merit. *Strickland*, 466 U.S. at 697. Moreover, a habeas petitioner alleging ineffective assistance of counsel that he exhausted with the state courts bears a heavy burden, given the "doubly deferential" review of such a claim under § 2254(d)(1). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

Applying these standards, the TCCA correctly articulated and applied *Strickland* in rejecting Petitioner's ineffective-assistance claims. *See McMillon II*, at *8–14. As for counsel's preparation for and cross-examination of Mr. Haden, the TCCA found that Petitioner failed to present any proof showing how additional preparation would have altered the testimony or that counsel's approach was anything but strategic. *Id.* at *13. Petitioner likewise did not question trial counsel at the post-conviction hearing about his strategic decisions about that testimony. *Id.*

As for the evidence recovered from Mr. Guillory's residence, including a rifle and a mask that appeared unrelated to the shooting, the TCCA found that Petitioner failed to establish either deficient performance or prejudice. As to the rifle, Petitioner offered no proof that trial counsel's decision not to object was unreasonable or that admission of the evidence prejudiced the defense. *Id.* at *10. As to the mask, the TCCA noted that counsel did object to its introduction, despite counsel not using the specific term "objection," and therefore Petitioner could not establish deficient performance. *Id.* at *11.

Finally, with respect to counsel's failure to continue objecting to the prosecution's repeated use of language implying gang or warfare activity, the TCCA determined that Petitioner again failed to rebut the presumption that counsel's conduct was strategic. Trial counsel testified that he limited further objections out of concern that the jury was becoming annoyed by repeated interruptions, a judgment falling within the bounds of professional discretion. *Id.* at *9.

The Court finds that the TCCA correctly set forth and applied the *Strickland* standard to the relevant facts of Petitioner's case. Thus, Petitioner has not shown that the TCCA's denial of these claims was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. So Petitioner is not entitled to § 2254 relief for these claims.

### F. Victim's Son

Petitioner next claims that his trial counsel had a conflict of interest that entitles him to relief under § 2254 [Doc. 1, p. 10]. Petitioner asserts that (1) his trial counsel previously represented the victim's son; (2) the victim's son's testimony was exculpatory for Petitioner; and (3) the victim's son refused to testify at Petitioner's trial and threatened to lie about Petitioner's involvement in any such trial testimony because of counsel's prior representation [*Id.*]. That said, Petitioner procedurally defaulted this claim, and, in any event, lacks merit.

First, Petitioner procedurally defaulted this claim. Petitioner did not present this freestanding conflict of interest claim to the TCCA in his direct appeal [Doc. 15-20]. While Petitioner presented a similar ineffective assistance of counsel claim regarding Mr. Norman to the TCCA in his appeal of the denial of his post-conviction petition, that claim specifically asserted that his counsel was ineffective for failing to obtain consent regarding the alleged conflict or improper interview of the victim's son in his appeal [Doc. 15-32, p. 51–56]. That theory is substantively different from the freestanding conflict of interest claim asserted here. Because Petitioner failed to present "the same claim under the same theory" to the TCCA, this freestanding conflict of interest claim is procedurally defaulted, and Petitioner has not shown cause or prejudice to excuse that default.

Regardless of this default, however, this claim also lacks merit. To the extent that Petitioner asserts that he is entitled to a presumption of prejudice based on counsel's prior representation of the victim's son, this argument is misplaced. Under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), prejudice is presumed only where counsel "actively represented conflicting interests" and this "actual conflict of interest adversely affected his lawyer's performance." *Id.* at 345–50. But the Supreme Court has confined this presumption of prejudice to multiple concurrent

representation of criminal defendants. *Mickens v. Taylor*, 535 U.S. 162, 166–73 (2002). As Petitioner has not alleged, much less demonstrated, that his trial counsel concurrently represented both the victim's son and Petitioner, this presumption does not apply.

Without concurrent representation, conflict-of-interest claims are evaluated under *Strickland v. Washington. See Leonard v. Warden*, 846 F.3d 832, 844 (6th Cir. 2017) (citing *Stewart v. Wolfenbarger*, 468 F.3d 338, 350–351 (6th Cir. 2006)). Petitioner has not established any deficient performance or prejudice under that standard. At the post-conviction hearing, trial counsel testified that the victim's son stated that if he were forced to testify at trial, he would wear a t-shirt with Petitioner's likeness and gang signs to court [Doc. 15-27, p. 103]. Petitioner's counsel also testified that it was unclear whether the victim's son's testimony would be favorable or unfavorable to Petitioner [*Id.*] Under these circumstances, counsel's decision not to compel the victim's son to testify was objectively reasonable. Additionally, Petitioner has not presented any proof that he suffered prejudice due to the victim's son not testifying, such as testimony from the victim's son about what his trial testimony would have been if he testified.

Petitioner is thus not entitled to relief under § 2254 based on this claim.

## IV.    CERTIFICATE OF APPEALABILITY

The Court must now consider whether to issue a certificate of appealability ("COA"), should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas corpus proceeding only if he is issued a COA, and a court may issue a COA may only where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a

constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Petitioner has not made a substantial showing that any of his exhausted claims violated his constitutional rights, and reasonable jurists would not debate the Court's findings that Petitioner procedurally defaulted the claims that he did not exhaust with the TCCA or that the new claims in Petitioner's reply are untimely. Accordingly, a **COA SHALL NOT ISSUE**. The Court also **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

## V. CONCLUSION

For the reasons set forth above, the petition for § 2254 relief will be **DENIED**, and this action will be **DISMISSED**. A COA shall **NOT** issue.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

**ENTER:**

s/Clifton L. Corker
United States District Judge
